1

2

3                            UNITED STATES DISTRICT COURT

4                                  DISTRICT OF NEVADA

5                                         * * *
                                            )
6    FORTUNET, INC.,                        )
                                            )
7              Plaintiff,                    )
                                            )
8    v.                                     )          2:06-CV-00393-PMP-PAL
                                            )
9    GAMETECH ARIZONA CORP., and            )
     GAMETECH INTERNATIONAL, INC.,          )          ORDER
                                            )
10             Defendants.                   )
                                            )
11   _____)

12         Presently before the Court is Plaintiff FortuNet, Inc.'s Motion for Partial

13   Summary Judgment on the Issue of GTI's Violation of Nevada Gaming Law (Doc. #74)

14   with supporting exhibits (Doc. #76, #77, #78), filed on July 14, 2008.  Defendants filed an

15   Opposition (Doc. #88) on August 20, 2008.  Plaintiff filed a Reply (Doc. #97) on

16   September 12, 2008.

17         Also before the Court is Defendants' Motion for Summary Judgment (Doc. #75),

18   filed on July 14, 2008.  Plaintiff filed an Opposition (Doc. #90) on August 20, 2008.

19   Defendants filed a Request to File Defendants' Reply to Plaintiff's Opposition to

20   Defendants' Motion for Summary Judgment Under Seal (Doc. #99) and a Reply (Doc.

21   #100) on September 12, 2008.

22         Also before the Court is Plaintiff's Motion in Limine and to Strike (Doc. #79)

23   with supporting exhibit (Doc. #80), filed on July 15, 2008.  Defendants filed an Opposition

24   (Doc. #86) and Cross-Motion to Strike and for Sanctions (Doc. #92) on August 20, 2008.

25   Plaintiff filed a Reply (Doc. #95) and Opposition (Doc. #96) on September 12, 2008.

26   Defendants filed a Reply (Doc. #101) on September 26, 2008.

Also before the Court is Defendants' Motion to Strike Plaintiff's Expert Disclosure and Report of Scott Scherer and for Entry of Order Precluding Mr. Scherer from Testifying in this Action (Doc. #81), filed on July 18, 2008.  Plaintiff filed an Opposition (Doc. #89) on August 20, 2008.  Defendants filed a Reply (Doc. #98) on September 12, 2008.

Also before the Court is Defendants' Request to File Defendants' Opposition to Plaintiff's Motion for Partial Judgment on the Issue of GTI's Violation of Nevada Gaming Law Under Seal (Doc. #87), filed on August 20, 2008.  Plaintiff did not file an opposition.

**I.  BACKGROUND**

Plaintiff FortuNet, Inc. ("FortuNet") is a Nevada corporation involved in the development and manufacture of electronic gaming devices, including bingo games.  (Am. Compl. (Doc. #21) at 1-2.)  Defendant GameTech International, Inc. ("GTI") is a Delaware corporation involved in the manufacture and sale of electronic gaming equipment.  (Pl.'s Statement of Material Facts ["Pl.'s SMF"] (Doc. #76), Ex. 3 at F-7.)  Defendant GameTech Arizona Corporation ("GTA") is an Arizona corporation, and is GTI's wholly-owned subsidiary.  (Defs.' Mot. for Summ. J. ["Defs.' Mot."] (Doc. #75), Ex. 3 at 15; Pl.'s SMF, Ex. 1, Ex. 6 at 10.)

Plaintiff contends Defendants engaged in racketeering activity by manufacturing, selling, and distributing gaming devices in Nevada without a Nevada gaming license. Specifically, Plaintiff contends two of GTA's products, Bingo Enhanced Tabs System ("BETS") and Pay-N-Play, required a Nevada license to manufacture or distribute from Nevada.  According to Plaintiff, GTI developed aspects of these two software products in Nevada and distributed the products from Nevada without a Nevada license.  Plaintiff asserts GTI operated GTA as a sham to make it appear as if development, manufacture, and distribution occurred in California when it did not.  Plaintiff also contends Defendants falsely advertised they were Nevada-licensed entities when they were not.  Plaintiff asserts

that by advertising a Nevada address, GTI falsely represented to customers it had a Nevada gaming license.

GTI is located in Reno, Nevada.  (Pl.'s SMF, Ex. 3 at 1.)  GTI formed its wholly-owned subsidiary, GTA, to develop certain types of gaming devices, specifically Pay-N-Play and BETS, which GTI was not licensed to develop in Nevada.  (Defs.' Mot., Ex. 3 at 16-17; Pl.'s SMF, Dep. of Michael Hartman at 17-18.)  Pay-N-Play permits players to purchase bingo cards on a game-by-game basis rather than for a fixed number of games and BETS is a pull-tab game system.  (Pl.'s SMF, Ex. 2 at 2, 5.)  BETS and Pay-N-Play incorporate cashless wagering systems which would require a Nevada license to manufacture, sell, or distribute from Nevada.  (Pl.'s SMF, Dep. of Michael Hartman at 17-18.)

GTI rented for GTA a facility in Truckee, California.  (Pl.'s SMF, Ex. 6 at 6-7, Ex. 17; Defs.' Mot., Ex. 3 at 18.)  Programming for the cashless wagering system aspect of BETS was performed at the Truckee facility, but programming for the player user interface took place in Reno.  (Pl.'s SMF, Dep. of Michael Hartman at 20-21.)  The algorithm which shuffled the pull-tab tickets for BETS was written in Reno.  (Id. at 81-82.)  Testing and troubleshooting on Pay-N-Play and BETS took place on a test bed[1] at GTA's Truckee, California location, and no such work was performed on these products in Reno.  (Defs.' Mot., Ex. 7 at 22, 24, Ex. 8 at 21-22, 27, 29, 27, 29-40, 46-48; Pl.'s SMF, Dep. of Nelson Rudd at 31.)  BETS and Pay-N-Play software source code was maintained in Reno, but could not be worked on in the Reno office.  (Pl.'s SMF, 2/29/08 Dep. of Justin Goodman at 27.)  To work on the source code for these two products, employees had to log into computers in Truckee, download the source code, work on it in Truckee, compile the

---

[1]    A "test bed" is a set of computers used to test different pieces of software for functionality and development.  (Pl.'s SMF, Dep. of Nelson Rudd at 31.)

1  software, test it in Truckee, and then save the source code back to the database in Reno.

2  (Id. at 27-28.)

3          To distribute Pay-N-Play, BETS, and a third-party vendor's product called Game

4  Suite, GTA loaded the software onto hardware in Truckee, California, and shipped the

5  products to customers from Truckee.  (Defs.' Mot., Ex. 8 at 28-30.)  However, invoices for

6  GTA listed GTI's address in Reno.  (Pl.'s SMF, Ex. 10.)

7          GTI and GTA maintained a joint customer support number that was answered in

8  the Reno GTI office, which also had a test bed.  (Pl.'s SMF, 2/29/08 Dep. of Justin

9  Goodman at 7-8.)  GTI technicians provided telephone customer support on GTI and GTA

10  products through this phone number, however, when more serious problems developed with

11  BETS and Pay-N-Play, GTI employees would travel to the Truckee facility's test bed to

12  diagnose the problem.  (Id. at 8, 13-14.)  GTA had no employees of its own.  (Pl.'s SMF,

13  Ex. 9 at 4.)  Rather, it "borrow[ed] employees from GTI and [paid] GTI for such services."

14  (Id.)

15          GTI and GTA also operated a joint website at http://www.gametech-inc.com.

16  (Pl.'s SMF, Ex. 6 at 5.)  On its website, GTI describes itself as a "leading supplier of a

17  comprehensive line of electronic bingo equipment, including hand-held bingo units, fixed

18  base units and turnkey account and management software."  (Defs.' Mot., Ex. 2 at 1.)  The

19  website lists several GTI/GTA products, including Pay-N-Play.  (Id.)  According to the

20  website, Pay-N-Play is "offered by GameTech Arizona Corporation," at GTA's Truckee,

21  California address.  (Id.)  GTI's website also contains the following disclaimer:

22          Important Notice: Some or all of our products may not be legal in your
           jurisdiction.  Due to rapidly changing laws and regulations GameTech
23          cannot be responsible for the legality or use of this product by any
           particular customer.  All customers should determine for themselves
24          that the use of this product is permitted in their market.

25  (Id.)

26  ///

4

GTI and GTA operated in this fashion until the Nevada Gaming Control Board issued GTI a license to manufacture and distribute gaming devices in Nevada in October 2006.  (Defs.' Mot., Ex. 4; Pl.'s SMF, Ex. 18.)  Thereafter, GTA ceased to operate out of the Truckee location.  (Pl.'s SMF, Dep. of Jay Meilstrup at 21.)

In relation to this lawsuit, Plaintiff's President, Yuri Itkis ("Itkis"), could not identify any customers that were deceived by any GTI or GTA advertisement.  (Defs.' Mot., Ex. 13 at 44, 47-48.)  Itkis testified that he presumed GTI's customers were deceived because "they are still GameTech's customers and not ours."  (Id.)  Itkis also could not identify any lost sales or lost revenue as a result of any GTI advertisement or representation.  (Id. at 48-52.)  Plaintiff's expert, Scott Hampton, also could not identify a customer deceived by GTI/GTA's advertising or a lost sale as a result.  (Defs.' Mot., Ex. 16 at 38-39.)

Plaintiff brought suit in this Court asserting against Defendants claims for false advertising under the Lanham Act (count one), false advertising under the Nevada Deceptive Trade Practices Act ("NDTPA") (count two), violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (count three), and common law false advertising and unfair competition (count four).  In response to Defendants' previous motion to dismiss, this Court entered an Order (Doc. #38) holding Plaintiff's claim under the NDTPA in count two and Plaintiff's common law unfair competition claim in count four were preempted under Nevada law.  Thus, Plaintiff's remaining claims are RICO, false advertising under the Lanham Act, and common law false advertising.

Plaintiff now moves for partial summary judgment on the issue of whether Defendants violated Nevada gaming laws in support of Plaintiff's RICO claim.  Plaintiff argues no genuine issue of material fact remains that Defendants manufactured and distributed BETS and Pay-N-Play from Nevada in contravention of Nevada gaming law.  Plaintiff also moves to strike Defendants' references to the fact that the Nevada Gaming

1   Control Board ultimately issued Defendants a license.  Plaintiff contends that without being

2   able to examine what Defendants told the Board about Defendants' activities, Defendants

3   should not be able to infer the Board knew everything about Defendants' conduct and

4   nevertheless granted a license.

5        Defendants move for summary judgment on all of Plaintiff's remaining claims,

6   raising a variety of arguments in support.  Defendants also move to strike Plaintiff's expert,

7   and move to strike a statement in Plaintiff's brief that GTI's president, Jay Meilstrup

8   ("Meilstrup"), perjured himself.  Defendants request sanctions for Plaintiff's statement and

9   for Plaintiff's refusal to retract it.

10  **II.  SUMMARY JUDGMENT**

11       Defendants argue all of Plaintiff's claims fail because Plaintiff cannot establish

12  causation or damages.  Additionally, Defendants argue Plaintiff's RICO claim fails because

13  GTI and GTA are not a separate person and enterprise under RICO and Plaintiff can present

14  no evidence Defendants violated Nevada gaming laws.  As to Plaintiff's Lanham Act and

15  common law false advertising claims, Defendants contend no evidence exists that any

16  customer was deceived by Defendants' advertisements.

17       Plaintiff responds that it can establish damages as it is entitled to recover

18  Defendants' unjustly obtained profits.  Plaintiff also argues GTI and GTA, as separate

19  corporate entities, may constitute a separate person and enterprise under RICO.  As to the

20  false advertising claims, Plaintiff contends it need not show any customer was actually

21  deceived where Defendants' advertisements were literally false.

22       Summary judgment is appropriate if "the pleadings, the discovery and disclosure

23  materials on file, and any affidavits show that there is no genuine issue as to any material

24  fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

25  The substantive law defines which facts are material.  Anderson v. Liberty Lobby, Inc., 477

26  U.S. 242, 248 (1986).  All justifiable inferences must be viewed in the light most favorable

to the non-moving party.  <u>County of Tuolumne v. Sonora Cmty. Hosp.</u>, 236 F.3d 1148, 1154 (9th Cir. 2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact.  <u>Fairbank v. Wunderman Cato Johnson</u>, 212 F.3d 528, 531 (9th Cir. 2000).  The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. <u>Id.</u>; <u>Far Out Prods., Inc. v. Oskar</u>, 247 F.3d 986, 997 (9th Cir. 2001).

### A. RICO - Count Three

Plaintiff brings count three under 18 U.S.C. § 1964(c) alleging Defendants conducted an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  (Am. Compl. at 6-7.)  Section 1964(c) permits "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter" to sue and recover three times the "damages he sustains" plus the costs of the suit.  To establish a claim under the federal civil RICO statute, a plaintiff must allege and prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'"  <u>Ove v. Gwinn</u>, 264 F.3d 817, 825 (9th Cir. 2001) (quoting 18 U.S.C. § 1964(c)).

To prove causation for a claim under § 1964(c), a plaintiff must show the defendant's racketeering activity "not only was a 'but for' cause of his injury, but was the proximate cause as well."  <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 268 (1992). To determine whether a plaintiff has shown proximate cause, the Court considers three factors:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

1    <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1055 (9th Cir. 2008).

2            The United States Supreme Court analyzed a civil RICO claim similar to the

3    present suit and determined the plaintiff failed to establish proximate cause.  In <u>Anza v.</u>

4    <u>Ideal Steel Supply Corp.</u>, the plaintiff sold steel mill products and related supplies and

5    services.  547 U.S. 451, 453 (2006).  The defendants were the plaintiff's primary competitor

6    and its owners.  <u>Id.</u> at 453-54.  The plaintiff brought a civil RICO claim, asserting the

7    defendants engaged in a racketeering scheme aimed at increasing sales and market share at

8    the plaintiff's expense.  <u>Id.</u> at 454.  The plaintiff alleged the defendants did not charge sales

9    tax to cash-paying customers which permitted the defendants to reduce prices without

10   affecting profit margin.  <u>Id.</u>  The defendants submitted false tax returns to the State of New

11   York in furtherance of this scheme.  <u>Id.</u>  The plaintiff thus brought two civil RICO claims

12   alleging mail and wire fraud based on the mailed and electronically filed false tax returns as

13   the racketeering activity.  <u>Id.</u>

14           The Supreme Court ruled the plaintiff failed to establish the defendants' alleged

15   racketeering activity proximately caused harm to the plaintiff because "the cause of [the

16   plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct

17   from the alleged RICO violation (defrauding the State)."  <u>Id.</u> at 458.  In reaching this

18   conclusion, the Supreme Court noted the difficulty in ascertaining damages where the

19   plaintiff alleged loss of sales resulting from its competitor's decreased prices for

20   cash-paying customers.  The Court noted that the defendants "could have lowered . . . prices

21   for any number of reasons unconnected to the asserted pattern of fraud."  <u>Id.</u>

22           Moreover, a "second discontinuity" existed between the RICO violation and the

23   asserted injury because the plaintiff's lost sales "could have resulted from factors other than

24   [the defendants'] alleged acts of fraud.  Businesses lose and gain customers for many

25   reasons, and it would require a complex assessment to establish what portion of [the

26   plaintiff's] lost sales were the product of [the defendants'] decreased prices."  <u>Id.</u> at 459.

1    Finally, the Court concluded the complex damages calculation that would be

2    required demonstrated proximate cause was lacking:

3        A court considering the claim would need to begin by calculating the
         portion of [the defendants'] price drop attributable to the alleged
4        pattern of racketeering activity. It next would have to calculate the
         portion of [the plaintiff's] lost sales attributable to the relevant part of
5        the price drop. The element of proximate causation recognized in
         Holmes is meant to prevent these types of intricate, uncertain inquiries
6        from overrunning RICO litigation. It has particular resonance when
         applied to claims brought by economic competitors, which, if left
7        unchecked, could blur the line between RICO and the antitrust laws.

8    Id. at 459-60.

9    Here, a more direct victim of the alleged wrongful conduct exists that can be

10   counted on to vindicate Nevada gaming laws. Nevada has enacted a comprehensive

11   statutory scheme for regulating gaming. See Nev. Rev. Stat. tit. 41, ch. 463. To the extent

12   GTI has evaded Nevada's gaming law requirements, Nevada's Gaming Control Board and

13   Commission are well suited to address any such violations.

14   Additionally, it will be difficult to ascertain the amount of Plaintiff's damages

15   attributable to GTI's alleged wrongful conduct. The Court would have to calculate the

16   portion of GTI's sales attributable to its alleged evasion of Nevada gaming laws. Even

17   assuming Plaintiff is correct that any sale of BETS and Pay-N-Play is attributable to GTI's

18   wrongful conduct, the Court next would have to calculate the portion of Plaintiff's lost sales

19   attributable to GTI's allegedly wrongful behavior. Plaintiff has failed to present evidence

20   on this issue. Plaintiff cannot identify a single lost sale resulting from GTI's alleged

21   evasion of Nevada gaming laws and Plaintiff's damages expert specifically did not address

22   "the magnitude of FortuNet's lost sales as of the report date." (Pl.'s Opp'n to Defs.' Mot.

23   for Summ. J. ["Pl.'s Opp'n"] (Doc. #90), Ex. 36 at 1.)

24   Plaintiff contends it is entitled to all of GTI's profits from the sale of BETS and

25   Pay-N-Play based on its conclusion that any sales to GTI are lost sales to Plaintiff.

26   However, the evidence before the Court demonstrates there are several competitors in the

9

field. (Pl.'s SMF, Ex. 2 at 7 (listing as GTI's competitors in the industry California Concepts; Bettina Corp.; Bingo Brain, Inc.; EZ Bingo; FortuNet, Inc.; Planet Bingo; and BK Entertainment).) Consequently, a customer who purchased from GTI is not necessarily a lost sale for Plaintiff. The customer may have chosen to do business with one of Plaintiff's other competitors rather than Plaintiff. Plaintiff has not presented an affidavit or testimony from a single customer stating that if it had known GTI was evading Nevada gaming laws, it would have purchased products from Plaintiff rather than from GTI or from Plaintiff's other competitors. This leads to the final difficulty with Plaintiff's causation argument. Permitting Plaintiff to recover all of GTI's profits without apportioning for those sales lost only to Plaintiff would lead to the risk of multiple recoveries, as GTI's other competitors could make the same allegations and also seek to recover all of GTI's profits.

For these reasons, Plaintiff has failed to raise a genuine issue of material fact that Defendants' alleged racketeering activity proximately caused harm to Plaintiff. The Court will grant Defendants' motion for summary judgment as to count three. Because the Court is granting Defendants' motion for summary judgment on Plaintiff's RICO claim, the Court will deny as moot Plaintiff's motion for partial summary judgment as to Defendants' evasion of Nevada gaming laws. Additionally, because Plaintiff's expert testimony is directed at Defendants' alleged racketeering activity, the Court will deny as moot Defendants' motion to strike Scott Scherer's report. The Court also will deny as moot Plaintiff's Motion in Limine and to Strike, as the testimony regarding GTI's Nevada license is relevant only to the RICO claim.

///

///

///

///

///

10

**B.  Lanham Act (count one) & Common Law False Advertising (count four)[2]**

To establish a false advertising claim under § 43(a) of the Lanham Act (15

U.S.C. § 1125(a)), a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial
> advertisement about its own or another's product; (2) the statement
> actually deceived or has the tendency to deceive a substantial segment
> of its audience; (3) the deception is material, in that it is likely to
> influence the purchasing decision; (4) the defendant caused its false
> statement to enter interstate commerce; and (5) the plaintiff has been or
> is likely to be injured as a result of the false statement, either by direct
> diversion of sales from itself to defendant or by a lessening of the
> goodwill associated with its products.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (footnote

omitted).  Falsity under the Lanham Act includes statements that are literally false, either on

their face or by necessary implication, or statements that are literally true but likely to

mislead or confuse consumers.  Id.  "Where a statement is not literally false and is only

misleading in context . . . proof that the advertising actually conveyed the implied message

and thereby deceived a significant portion of the recipients becomes critical."  William H.

Morris Co. v. Group W, Inc., 66 F.3d 255, 258 (9th Cir. 1995).  However, where a

defendant intentionally misled consumers or the advertisement is literally false, a

presumption arises that consumers were in fact deceived and the burden shifts to the

defendant to prove otherwise.  Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144,

153 (2d Cir. 2007); William H. Morris Co., 66 F.3d at 258.

The presumption consumers were deceived by a literally false ad does not permit

a plaintiff to recover damages "without other proof that such damages occurred."  Balance

Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 693 (6th Cir. 2000).  Thus, in

addition to establishing falsity (either by presumption or through direct proof customers

---

[2]  The parties have treated Plaintiff's common law false advertising claim as identical to its
Lanham Act false advertising claim, and the Court therefore will do the same without citation to
Nevada false advertising law.

actually were deceived), a plaintiff must prove "both the fact and the amount of damage." Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993).  In some circumstances, harm to the plaintiff is presumed.  For example, where a defendant advertises its own products as the plaintiff's ("palming off") or engages in direct comparative advertising, "the presumption that plaintiff's good will has suffered significant damages seems justified."  Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 209 n.8 (9th Cir. 1989); see also Time Warner Cable, Inc., 497 F.3d at 161-62 (noting injury and causation may be presumed in direct comparison false advertisement case).  Courts presume injury to the plaintiff from a false direct comparison ad "because a false comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer."  Time Warner Cable, Inc., 497 F.3d at 161-62 (quotation omitted).

However, when a defendant's advertising does not directly compare its products with the plaintiff's products, when numerous competitors participate in the market, or when the plaintiff's and defendant's products are aimed at different market segments, "injury to a particular competitor may be a small fraction of the defendant's sales, profits, or advertising expenses."  Harper House, Inc., 889 F.2d at 209 n.8.  In such circumstances "it is erroneous to apply a rebuttable presumption of harm in favor of a competitor.  Otherwise, a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor in the same market."  Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1334 (8th Cir. 1997) (citing Harper House, Inc., 889 F.2d at 209); see also Time Warner Cable, Inc., 497 F.3d at 162 (stating that an ad that is misleading regarding the defendant's own product but which does not directly reference a competitor's product equally injures all competitors and thus the plaintiff must present "some indication of actual injury and causation . . . to ensure [the] plaintiff's injury [is] not speculative") (quotation omitted)); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1227 (11th Cir. 2008) (concluding the plaintiff failed to show presumptive irreparable harm entitling it to injunctive relief merely by

1   establishing the defendant's non-comparative false ad and that the plaintiff was a

2   competitor in the marketplace).

3          Although a plaintiff must establish injury resulting from the defendant's false

4   advertising, once injury is established the plaintiff's inability to show actual damages does

5   not preclude recovery for a Lanham Act false advertising claim.  <u>Lindy Pen Co., Inc.</u>, 982

6   F.2d at 1411.  Because it often is difficult for a plaintiff to prove actual damages in a false

7   advertising case, the Lanham Act permits a court, "subject to the principles of equity," to

8   award damages based on the defendant's profits on an unjust enrichment theory.  15 U.S.C.

9   § 1117(a); <u>Lindy Pen Co., Inc.</u>, 982 F.2d at 1407.  When assessing profits, the plaintiff need

10  prove only the defendant's sales and the defendant must prove any costs or deductions

11  therefrom.  15 U.S.C. § 1117(a).  Where the damage award is based on the recovery of the

12  defendant's profits, the Court, in its discretion, may adjust the judgment to "such sum as the

13  court shall find to be just, according to the circumstances of the case."  <u>Id.</u>; <u>Southland Sod</u>

14  <u>Farms</u>, 108 F.3d at 1146 (stating the Court, in its discretion, may "fashion relief, including

15  monetary relief, based on the totality of the circumstances").  In making these

16  determinations, the Court should consider the nature of the infringing conduct, the

17  defendant's intent, and any adverse effects on the plaintiff.  <u>Lindy Pen Co., Inc.</u>, 982 F.2d at

18  1405.  An award of the defendant's profits "shall constitute compensation and not a

19  penalty."  15 U.S.C. § 1117(a).

20              1.  GTI's Website

21          Plaintiff asserts GTI's website, which lists GTI at its Reno, Nevada address as the

22  entity to contact, "necessarily implies" GTI is licensed in Nevada to manufacture and

23  distribute the products listed on its website.  (Pl.'s Opp'n at 16.)  However, GTI's listing of

24  its address is literally true.  Because GTI's listing of its corporate address in Nevada is not

25  literally false and purportedly is misleading only in context, Plaintiff must present proof that

26  the website actually conveyed the implied message that GTI was Nevada-licensed and

thereby deceived a significant portion of customers who viewed the website.  Plaintiff has

presented no evidence raising a genuine issue of material fact that a single customer

received the implied message and was deceived by it.  Moreover, Plaintiff has not presented

any evidence it lost a single sale or suffered some damage to its own goodwill as a result.

Defendants therefore are entitled to summary judgment as to Plaintiff's Lanham Act and

common law false advertising claims based on the listing of the Nevada address and the

supposedly implied impression from the website that GTI is Nevada-licensed.

### 2.  Manufacture of Pay-N-Play in Reno

Plaintiff next contends GTI distributed ads at trade shows stating that Pay-N-Play

is offered by GameTech at its Reno, Nevada address and stating Pay-N-Play is a registered

trademark of GTI.  Plaintiff argues these two statements suggest to a consumer that GTI

was licensed to develop, manufacture, and distribute Pay-N-Play from Nevada.  Plaintiff

also asserts other advertisements which list GTA as the offering entity are false because

GTA did not develop Pay-N-Play from California.  Additionally, Plaintiff contends the ads

convey an "overall commercial impression" that Pay-N-Play comes from "GameTech."

(Pl.'s Opp'n at 18.)  Finally, Plaintiff argues Defendants falsely represented the Reno

facility was part of GTA.

Defendants have advertised Pay-N-Play with a flyer listing GTI's Reno, Nevada

address.  (Pl.'s Opp'n, Ex. 28.)  The flyer also identifies GTI as the trademark holder to the

name Pay-N-Play.  (Id.)  However, the advertisement does not state that GTI is a Nevada-

licensed entity.  While perhaps a consumer would be left with that impression from the

context of the flyer combined with the Nevada address, Plaintiff has failed to present

evidence raising a genuine issue of material fact that any customer received the implied

message and was deceived by it, or that Plaintiff lost a sale or suffered other harm as a

result.

///

14

1    As for the advertisements related to GTA, the ads state the product is "offered

2    by" GTA out of California.  The ads make no statement about where Pay-N-Play was

3    developed or manufactured, and Plaintiff has presented no evidence any customer received

4    an implied message that Pay-N-Play was developed or manufactured in California and was

5    deceived by that implied message.  Further, Plaintiff has presented no evidence any

6    customer received an implied message that GTI and GTA were the same entity operating

7    out of the Reno facility, and that as a result, the customer wrongly believed all products

8    were Nevada-licensed as they emanated from Reno, Nevada.  As with Plaintiff's other

9    claims, Plaintiff also fails to present any evidence of lost sales or other harm resulting from

10    Defendants' alleged false advertising.  The Court therefore will grant Defendants' motion

11    for summary judgment on Plaintiff's Lanham Act and common law false advertising claims

12    based on these arguments.

13                              3.  BETS as a GTA Product

14    Next, Plaintiff contends Defendants' advertisements of BETS are literally false

15    because Defendants advertise BETS as a GTA product when it was made and sold in Reno

16    by GTI.  Additionally, the ads identify BETS as a GTA trademark when GTI owns the

17    mark, and the use of similar marks creates the commercial impression the companies are the

18    same and all products come from Reno, Nevada.  Finally, Plaintiff contends Defendants'

19    advertising gives the impression that BETS is a "GameTech" product, not a GTI product.

20    Some of Defendants' advertisements identify BETS as a trademark of GTA.

21    (Pl.'s SMF, Ex. 4.)  However, the mark actually is registered to GTI.[3]  (Pl.'s SMF, Ex. 14.)

22    Further, the ads contain a "GameTech" logo without specifying whether that logo refers to

23    GTI or GTA.

24

25    _____

26    [3] Defendants suggest GTI may have licensed the mark to GTA, however, Defendants provide
no evidence in support.

1    While this evidence raises a genuine issue of material fact that the advertisements

2   are literally false as to the true holder of the trademark, Plaintiff fails to explain how the

3   fact that GTI advertises its wholly owned subsidiary as the owner of a certain registered

4   mark, when instead GTI owns the mark, is material or caused Plaintiff any injury.  Even

5   assuming mere ownership of a trademark could imply possession of a Nevada gaming

6   license, the alleged falsity of these particular advertisements would not support Plaintiff's

7   theory that Defendants' advertisements imply a Nevada license.  The advertisements at

8   issue identify GTA as the trademark owner, and thus, if anything, would imply the product

9   emanates from California, not Nevada.  Further, as the Court previously explained, Plaintiff

10   has not identified a single customer who received the implied message that GTI and GTA

11   are the same entity operating out of Reno, Nevada and hence are Nevada-licensed, or any

12   customer that was deceived by such an implied message.

13    Moreover, Plaintiff has not connected the alleged falsity of these ads to any harm

14   to Plaintiff.  Awarding to Plaintiff all of Defendants' profits merely because their

15   advertisements identified the wholly owned subsidiary as the trademark owner rather than

16   the parent, or because they put pictures of the Reno facility on a GTA brochure without any

17   evidence consumers would even be able to identify the Reno facility as a Nevada location,

18   would not comport with equitable principles.  As with Plaintiff's other claims, Plaintiff

19   seeks to hold Defendants liable for an implied misrepresentation without submitting proof

20   that any customers received the implied message, were deceived by it, and would have

21   purchased products from Plaintiff--rather than other competitors--had they know the truth.

22   An award of Defendants' profits under these circumstances would amount to a penalty, not

23   compensation.  The Court therefore will grant Defendants' motion for summary judgment

24   with respect to a damages claim for alleged false advertising related to the BETS trademark,

25   and for alleged false advertising regarding pictures of the Reno facility on GTA ads and the

26   "overall commercial impression" that the two entities are the same, operate out of Reno,

1    and thus are Nevada-licensed.

2                    4.  BETS as Class II Gaming

3            Finally, Plaintiff contends Defendants' advertisements that BETS is class II

4    gaming are literally false.  Plaintiff asserts the advertising of a game as class II is material

5    because class II games do not require the same regulation and licensing as a class III game

6    does.  Plaintiff asserts BETS is not class II gaming because it does not employ any tangible

7    medium, such as paper pull-tabs, for use in conjunction with the electronic device.

8    Defendants respond that BETS is class II because it can be played in a tangible paper

9    medium.  Defendants also contend Plaintiff cannot show damages.

10           The Indian Gaming Regulatory Act ("IGRA") provides "a statutory basis for the

11   operation of gaming by Indian tribes as a means of promoting tribal economic development,

12   self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  IGRA places games

13   played on Indian land into three classes: class I consists of traditional Indian games or social

14   games played for prizes of minimal value; class II includes bingo and games similar to

15   bingo, plus certain card games; class III is comprised of all games not in classes I or II.  See

16   id. §§ 2703(6)-(8).  Categorization of games among the three classes corresponds to

17   different levels of federal, tribal, and state oversight.  Cabazon Band of Mission Indians v.

18   Nat'l Indian Gaming Comm'n, 14 F.3d 633, 634-35 (D.C. Cir. 1994).  For example, class

19   III games are permissible on Indian land only if the tribe has negotiated a tribal-state

20   compact approved by the Secretary of the Interior.  Id. (citing 25 U.S.C. §§ 2710(d)(1) &

21   (d)(8)).

22           IGRA defines class II gaming as:

23           the game of chance commonly known as bingo (whether or not
             electronic, computer, or other technologic aids are used in connection
24           therewith)--
                     (I) which is played for prizes, including monetary prizes,
25                   with cards bearing numbers or other designations,
                     (II) in which the holder of the card covers such numbers
26                   or designations when objects, similarly numbered or

                                              17

1    designated, are drawn or electronically determined, and
    (III) in which the game is won by the first person
2    covering a previously designated arrangement of
    numbers or designations on such cards,
3   including (if played in the same location) pull-tabs, lotto, punch
   boards, tip jars, instant bingo, and other games similar to bingo.
4

5 25 U.S.C. § 2703(7)(A)(i).  Class II does not include "electronic or electromechanical

6 facsimiles of any game of chance or slot machines of any kind."  Id. § 2703(7)(B)(ii).

7    Congress created the National Indian Gaming Commission ("NIGC") to regulate

8 tribal gaming.  "The NIGC's broad powers include inspecting tribes' books and records,

9 approving tribal-state pacts, levying and collecting civil fines, monitoring and even shutting

10 down games, and promulgating regulations and guidelines it deems appropriate to

11 implement IGRA."  United States v. 103 Elec. Gambling Devices, 223 F.3d 1091, 1095 (9th

12 Cir. 2000) (citing 25 U.S.C. §§ 2705-06, 2713).  Pursuant to its statutory authority, NIGC

13 has developed regulations regarding the difference between class II and class III gaming.

14 NIGC regulations include within class II gaming the game of pull-tabs.  25 C.F.R.

15 § 502.3(b).

16    Like the statute, NIGC defines class III gaming as "all forms of gaming that are

17 not class I gaming or class II gaming, including, but not limited to . . . electronic or

18 electromechanical facsimiles of games of chance."  25 C.F.R. § 502.4.  NIGC has defined

19 an electronic or electromechanical facsimile to mean "a game played in an electronic or

20 electromechanical format that replicates a game of chance by incorporating all of the

21 characteristics of the game, except when, for bingo, lotto, and other games similar to bingo,

22 the electronic or electromechanical format broadens participation by allowing multiple

23 players to play with or against each other rather than with or against a machine."  25 C.F.R.

24 § 502.8.

25    BETS is a pull-tab game.  (Pl.'s SMF, Dep. of Michael Hartman at 54-55.)  Pull-

26 tabs commonly are played through a paper format.  Cabazon Band of Mission Indians, 14

F.3d at 635.  In pull-tabs, the player purchases a card from a set of cards referred to as "the deal."  Id.  The deal contains a predetermined number of winning cards.  Id.  The player pulls open the paper tab on the card to determine if it is a winning card.[4]  Id.

Like other pull-tab games, BETS has a certain number of pre-determined winning tickets within the deal.  (Pl.'s SMF, Dep. of Michael Hartman at 54-55.)  Although not entirely clear from the parties' submissions, it appears computer software creates the tickets comprising each deal.  (Id. at 81.)  The tickets within the deal initially are shuffled through a computer software generated algorithm to determine the order the cards will be dispensed to players.  (Id. at 54, 81.)  BETS permits displaying the outcome of pull-tab games as represented by a nine-line slot machine, where the number of lines played determines from which deal of pull-tabs the player will draw.  (Id. at 59-60, 62.)  In addition to the electronic representation, players also may play pull-tabs on BETS by purchasing paper pull-tabs, which are printed at the point of sale.  (Id. at 63; Pl.'s Opp'n, Dep. of Michael Hartman at 67; Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Doc. #100), Ex. 4 at 65-66.)  However, it is unclear whether Defendants ever pre-printed pull-tabs from the deals prior to providing the product to Defendants' customers, i.e., bingo hall operators.  (Pl.'s Opp'n, Dep. of Michael Hartman at 67-68.)  Defendants have advertised BETS as class II gaming.  (Pl.'s SMF, Ex. 4.)

Other courts have evaluated whether certain pull-tab games or associated devices constituted class II gaming.  For example, in Sycuan Band of Mission Indians v. Roache, the United States Court of Appeals for the Ninth Circuit considered whether the "Autotab Model 101 electronic pull-tab dispenser" was an electronic aid and thus class II gaming, or whether it was an electronic facsimile and thus class III gaming.  54 F.3d 535, 541 (9th Cir.

---

[4]  A patent application provided as an exhibit in this case provides a similar description of a traditional pull-tab game.  (Pl.'s SMF, Ex. 8 at F00177.)

1    1994).  The Ninth Circuit described the Autotab as:

> a self-contained unit containing a computer linked to a video monitor
> and a printer.  The player inserts money and sees a video reproduction
> of a paper pull-tab ticket.  The player electronically reveals concealed
> numbers to determine whether he or she is a winner.  If a winner, the
> player may cause the machine to print out a winning ticket for
> redemption by a cashier or may add the winning amount to a credit
> balance for further play.  The game retains the fundamental
> characteristics of the paper version of pull-tab:  the video pull-tab
> machine is supplied with a computer-chip cartridge that insures a
> predetermined and known number of winning tickets from a finite pool
> of tickets with known prizes; when all tickets have been played, all the
> prizes will have been awarded.

Id.  The Ninth Circuit held the Autotab was class III gaming because it consisted of

"self-contained computer games copying the pull-tab principle, and they are played

electronically."  Id. at 542.

The United States Court of Appeals for the D.C. Circuit likewise examined an

electronic version of pull-tabs in Cabazon Band of Mission Indians.  For the game at issue

in Cabazon, the computer randomly selected a card for the player, pulled the tab at the

player's direction, and displayed the result on a computer screen. 14 F.3d at 635.  The D.C.

Circuit concluded the electronic version of pull-tabs constituted class III gaming because it

"exactly replicates the paper version of the game," and "wholly incorporated [paper pull-

tabs] into an electronic or electromechanical version."  Id. at 636.

In contrast, the D.C. Circuit found a device known as the "Lucky Tab II" to be

class II gaming as an electronic aid, rather than an electronic facsimile.  The Lucky Tab II

was a machine that dispensed pull-tabs from a roll containing thousands of tabs by cutting

the pull-tab from the roll and dropping it into a tray.  Diamond Game Enters., Inc. v. Reno,

230 F.3d 365, 367 (D.C. Cir. 2000).  The machine also contained a bar code scanner that

automatically read the tab and displayed the results on a video screen.  Id.  To collect any

winnings, the player had to present the winning tab to a clerk.  Id. at 368.

///

1   The D.C. Circuit concluded Lucky Tab II was class II because it "merely displays
2   the contents of a paper pull-tab.  Instead of using a computer to select patterns, the Lucky
3   Tab II actually cuts tabs from paper rolls and dispenses them to players.  In other words, the
4   game is in the paper rolls, not, as in the case of the Cabazon machine, in a computer."  Id. at
5   370.  The Lucky Tab II essentially was a dispenser of paper tabs which, without the paper
6   tabs, had no gaming function, and it contained no internal computer to generate the game.
7   Id.  Consequently, the D.C. Circuit found the Lucky Tab II "is not a facsimile of paper
8   pull-tabs, it is paper pull-tabs."  Id.

9   Viewing the evidence and all reasonable inferences therefrom in the light most
10  favorable to Plaintiff, a genuine issue of material fact remains regarding whether
11  Defendants falsely advertised BETS as class II gaming when in fact it is class III gaming.
12  Although the description of the game from the exhibits is not entirely clear, a reasonable
13  inference from the evidence provided is that BETS electronically generates the game
14  through software which creates the tickets and shuffles the deal prior to the product being
15  provided to Defendants' customers.  Unlike Lucky Tab II, BETS is not merely a dispenser
16  of paper pull-tabs.  Rather, it is more akin to Autotab in Sycuan Band of Mission Indians or
17  the electronic pull-tabs in Cabazon Band of Mission Indians because it copies the game of
18  paper pull-tabs in electronic format.  Although there was testimony players could receive
19  paper pull-tabs from BETS, a reasonable inference from the testimony is that the computer
20  generated the paper ticket.  Consequently, the tangible paper tab in BETS is a paper
21  representation of an electronic game like Autotab, as opposed to the Lucky Tab II, which
22  generated an electronic representation of a paper game.

23  However, Plaintiff has not presented evidence raising a genuine issue of material
24  fact that Plaintiff was injured by Defendants' alleged false advertising.  The BETS
25  advertisements tout only Defendants' products, and make no comparison to Plaintiff's
26  products.  Because Defendants allegedly falsely advertised their own product and did not

use Plaintiff's trademarks, palm off their product as Plaintiff's, or directly compare BETS

to Plaintiff's products, no presumption arises that Defendants' advertisements harmed

Plaintiff.  Additionally, Plaintiff has not presented any other evidence raising a genuine

issue of material fact of harm.  Plaintiff presented no evidence of lost sales.  The evidence

before the Court demonstrates there were several competitors in the marketplace and

Plaintiff has presented no evidence that had consumers known BETS was class III instead

of class II, they would have purchased their products from Plaintiff rather than some other

competitor.

Where no presumption of harm to the particular plaintiff arises and the plaintiff

presents no other evidence of injury, the plaintiff has failed to establish an essential element

of its claim for damages.  For example, in Harper House, Inc., the plaintiff claimed the

defendant deceived consumers by showing a prototype of the defendant's product in

advertisements and then selling a different version of the product. 889 F.2d at 208.  The

Ninth Circuit presumed customers were deceived because the advertisements about the

defendant's product were literally false.  Id. at 209.  Additionally, the Court recognized that

in certain circumstances, a court may presume the amount of a Lanham Act plaintiff's

damages equals the amount the defendant spent in false advertising.  Id. at 209 (citing

U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1041 (9th Cir. 1986)).

However, "the amount defendants spent on advertising is not . . . a presumption

of the fact of injury.  Courts distinguish between the amount of proof needed to show that

some damages were the certain result of a section 43(a) violation and the amount of proof

needed to ascertain the exact amount of damage."  Id.  "[A]ctual evidence of some injury

resulting from the deception is an essential element of the plaintiff's case."  Id. at 210

(emphasis omitted).  Because the plaintiff had presented no evidence of lost profits, no

evidence that consumers were deceived, and no evidence of palming off, the Ninth Circuit

concluded the plaintiff failed to present any evidence it was injured as a result of the

1   defendant's false advertising.  Id.; see also Balance Dynamics Corp., 204 F.3d at 695

2   (holding that plaintiff's showing that defendant knowingly and willfully made false

3   statements did not entitle plaintiff to defendant's profits absent some proof the plaintiff lost

4   sales or the defendant gained sales); Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.,

5   951 F.2d 684, 695-96 (5th Cir. 1992) (holding that a jury verdict awarding the defendant's

6   profits on an unjust enrichment theory could not be sustained in the absence of proof

7   regarding palming off, trading on the plaintiff's good will, or the diversion of sales).

8   Because Plaintiff has failed to present evidence it was harmed by Defendants' allegedly

9   false advertisement, either by presumption or through other evidence, the Court will grant

10   Defendants' motion for summary judgment for a damages claim based on the alleged false

11   advertising of BETS as class II gaming.

12                           5.  Injunctive Relief

13          Under the Lanham Act, "'a competitor need not prove injury when suing to

14   enjoin conduct that violates section 43(a).'"  Southland Sod Farms, 108 F.3d at 1145

15   (quoting Harper House, Inc., 889 F.2d at 210).  The Amended Complaint seeks injunctive

16   relief under the Lanham Act, but the relief requested refers to requiring Defendants to

17   obtain a Nevada gaming license, enjoining Defendants from holding themselves out as

18   Nevada-licensed entities, and enjoining Defendants from manufacturing, selling, or

19   distributing gaming devices from Nevada.[5]  (Am. Compl. at 8-9.)  In their briefing on

20   summary judgment, the parties have not addressed whether Plaintiff is entitled to injunctive

21   relief regarding other advertising for which Plaintiff has raised a genuine issue of material

22   fact regarding falsity.  The Court therefore will order the parties to file supplemental briefs

23   regarding potential injunctive relief related to the advertisement of GTA as the BETS

24   trademark holder and the advertisement of BETS as class II gaming.  The parties each shall

25   _____

26          [5]  These forms of injunctive relief are moot, as GTI now has a Nevada license.

1   file an opening brief no later than December 23, 2008.  The parties each shall file a

2   response brief no later than January 9, 2009.

3   **III.  MOTION TO STRIKE AND FOR SANCTIONS**

4              Defendants move to strike a statement in Plaintiff's motion in limine (Doc. #79)

5   which states GTI's director, Meilstrup, perjured himself.  Defendants contend no court or

6   administrative tribunal has accused or convicted Meilstrup of perjury.  Defendants also

7   request sanctions for Plaintiff's failure to retract the statement.  Finally, Defendants request

8   sanctions for having to respond to Plaintiff's motion in limine because it raises issues upon

9   which this Court already has ruled.  Plaintiff responds that it has presented evidence

10  Meilstrup made false statements under oath to the Texas Lottery Commission when he

11  denied ever being a professional gambler because Plaintiff presented the transcript from

12  Meilstrup's deposition at which he testified that he had been a professional gambler and

13  that is how he began working in the gaming industry.  Additionally, Plaintiff argues its

14  motion in limine is meritorious and not sanctionable.

15             Meilstrup submitted forms to the Texas Lottery Commission in 2006 and 2007

16  which asked:  "Are you or have you ever been a professional gambler or gambling

17  promoter?"  (Pl.'s SMF, Ex. 16.)  The box is marked "No" and the form is signed by

18  Meilstrup under penalty of perjury.  (Id.)  In Meilstrup's deposition in this action on April

19  16, 2008, the following exchange took place:

20          Q:  Okay.  Could you just provide me with a high-level description of
            your employment between the time you graduated from college in '82
21          until you went to work for GTI?
            A.  Sure.  I graduated from college, had a short stint in the nuclear
22          industry, working with Bechtel Power Corporation.  Once the nuclear
            industry collapsed after Three Mile Island, I ended up being a
23          professional gambler in Reno, Nevada, and from that entered the
            gaming industry, and I've held various senior management positions in
24          casino operations as well as manufacturing of gaming devices.

25  (Pl.'s SMF, Dep. of Jay Meilstrup at 11.)

26  ///

1    Defendants make no effort to explain the inconsistency in Meilstrup's sworn

2    statements, but argue Plaintiff's use of the word "perjury" when Meilstrup has never been

3    charged or convicted of perjury must be stricken and sanctioned.  Plaintiff did not state

4    Meilstrup was a convicted perjurer.  Plaintiff's use of the word "perjury" is perhaps

5    gratuitous, inflammatory, and argumentative, but Plaintiff had an evidentiary basis for

6    arguing Meilstrup is lacking in credibility due to conflicting statements under oath.  The

7    Court will deny Defendants' motion to strike and for sanctions.  Additionally, the Court will

8    deny Defendants' motion for sanctions for having to respond to the motion <u>in limine</u> as the

9    motion was not frivolous or otherwise sanctionable.

10   **IV.  CONCLUSION**

11    IT IS THEREFORE ORDERED that Plaintiff FortuNet, Inc.'s Motion for Partial

12   Summary Judgment on the Issue of GTI's Violation of Nevada Gaming Law (Doc. #74) is

13   hereby DENIED.

14    IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment

15   (Doc. #75) is hereby GRANTED.

16    IT IS FURTHER ORDERED that Plaintiff's Motion <u>in Limine</u> and to Strike

17   (Doc. #79) is hereby DENIED.

18    IT IS FURTHER ORDERED that Defendants' Cross-Motion to Strike and for

19   Sanctions (Doc. #92) is hereby DENIED.

20    IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiff's

21   Expert Disclosure and Report of Scott Scherer and for Entry of Order Precluding Mr.

22   Scherer from Testifying in this Action (Doc. #81) is hereby DENIED.

23    IT IS FURTHER ORDERED that Defendants' Request to File Defendants'

24   Opposition to Plaintiff's Motion for Partial Judgment on the Issue of GTI's Violation of

25   Nevada Gaming Law Under Seal (Doc. #87) is hereby GRANTED.

26   ///

1    IT IS FURTHER ORDERED that Defendants' Request to File Defendants'

2  Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment Under Seal

3  (Doc. #99) is hereby GRANTED.

4    IT IS FURTHER ORDERED that the parties shall submit cross-briefs on the

5  issue of injunctive relief on Plaintiff's false advertising claims related to advertising GTA

6  as the trademark holder to the name BETS and advertising BETS as class II gaming.  The

7  parties shall file opening briefs no later than December 23, 2008.  The parties shall file

8  response briefs no later than January 9, 2009.

9

10  DATED:   November 26, 2008

11

12  _____

13  PHILIP M. PRO
    United States District Judge